**The PEOPLE of the State of Colorado, Complainant,**

v.

**Richard B. PODOLL, Attorney–Respondent.**

**No. 93SA41.**

Supreme Court of Colorado, En Banc.

July 26, 1993.

Linda Donnelly, Disciplinary Counsel, and James C. Coyle, Asst. Disciplinary Counsel, Denver, for complainant.

Alex S. Keller, Denver, for attorney-respondent.

PER CURIAM.

The hearing board in this attorney disciplinary proceeding concluded that the respondent violated the Code of Professional Responsibility and recommended that he receive a private censure. A hearing panel of the Supreme Court Grievance Committee approved the board's findings and rec-

ommendation. The assistant disciplinary counsel has excepted to the recommended discipline as too lenient, and the respondent contends that the complaint should have been dismissed. We approve the board's findings, but conclude that a public censure is appropriate given the seriousness of the misconduct.

## I

The respondent was admitted to the bar of this court on May 22, 1978, is registered as an attorney upon this court's official records, and is subject to the jurisdiction of this court and its grievance committee. C.R.C.P. 241.1(b). After listening to the testimony of the complainant's witnesses and of the respondent, and considering the exhibits introduced into evidence by both sides, the hearing board found that the following facts were established by clear and convincing evidence.[1]

The complaining witness, Michael A. Tinaglia, retained the respondent in July or August of 1987, to represent him in a dispute with Tinaglia's business partner, Mark T. Clifton. In the previous year, Tinaglia and Clifton, as equal participants, purchased all of the stock of a small advertising corporation, Hesdorfer Associates, Inc., from its founder, Robert S. Hesdorfer. After the sale, Tinaglia, Clifton, and Hesdorfer served as the three directors of the corporation. During the summer of 1987, a dispute arose between Tinaglia and Clifton, resulting in a meeting between Clifton and Hesdorfer from which Tinaglia was excluded. It was apparently decided at the meeting that Tinaglia would be coaxed or ousted from the business and Tinaglia later found a note on his desk that instructed him to clean out his desk, leave the premises, and not return. While Tinaglia and the respondent did not enter into a written agreement, the board found that the terms of employment "were for Respondent to handle, and to advise Tinaglia concerning, all matters related to the Tinaglia–Clifton dispute."

In order to purchase Hesdorfer Associates, Tinaglia and Clifton had borrowed $40,000 from Tinaglia's father-in-law, Gerald Johannes. They had also taken out a $30,000 line of credit from OmniBank, secured in part by the titles to three vehicles owned by Tinaglia. Although Tinaglia was willing to be bought out by Clifton, he wanted Johannes to be repaid in full in addition to the release of his motor vehicles as security for the line of credit.

In September 1987, Johannes called the note given to him by Tinaglia and Clifton, and filed an action against both men to recover the balance due in addition to costs and attorney's fees. Although the respondent was aware that the action had been filed, he did not consider that he had been employed to represent Tinaglia in the suit and thought that the action was directed more at Clifton than Tinaglia. No answer or cross-claim was filed on Tinaglia's behalf in the action brought by Johannes to recover on the note.

Clifton was represented by a lawyer during the dispute with Tinaglia, and Clifton's lawyer and the respondent exchanged correspondence and telephone calls in the fall of 1987 in an effort to reach a settlement. Through his lawyer, Clifton answered the Johannes complaint and filed a cross-claim against Tinaglia, which cross-claim went unanswered. No motions for default were filed, however, and there was no further activity in the Johannes case during the fall and winter of 1987–88. In December 1987, Clifton's lawyer drafted an agreement designed to settle the Tinaglia–Clifton dispute. The proposed settlement provided for Clifton to pay off the Johannes and OmniBank loans, and for Tinaglia to surrender his interest in Hesdorfer Associates and to return or destroy his American Express card on the firm's account. The respondent sent a copy of the proposed agreement to Tinaglia by facsimile trans-

---

**1.** Although both parties excepted to the hearing panel's action, neither the assistant disciplinary counsel nor the respondent has provided this court with a transcript of the testimony at the hearing. We will therefore assume, as the parties do, that the hearing board's factual findings are supported by the evidence submitted to the board and are therefore binding on review. *People v. Phelps,* 837 P.2d 755, 755 n. 1 (Colo. 1992).

mission (FAX), discussed it with him over the telephone, and recommended some minor changes. Tinaglia was willing to sign the agreement to conclude the dispute if it incorporated the respondent's suggested changes.

The hearing board noted that at this point, the testimony of Tinaglia and the respondent diverged. Tinaglia testified that after the conversation above, he had no substantive discussions with the respondent and that he believed that the agreement to settle the dispute with Clifton was concluded. He had destroyed the American Express card and he had no intention of making any ownership claim to Hesdorfer Associates. Tinaglia further testified that he did not know that stock certificates had been issued in his name and thus did not know that he was required to sign them over to Clifton. Tinaglia was aware that Johannes had been paid and that the Johannes suit had been settled in January 1988. About the same time, Tinaglia received the titles to his vehicles in the mail from OmniBank and he assumed that the line of credit had also been paid off. Tinaglia testified that he believed that if there were signatures or actions on his part necessary to conclude the agreement, the respondent would either take those actions or notify him of what actions to take. Tinaglia stated that he believed that, as his attorney, the respondent would be authorized to sign Tinaglia's name to documents if necessary.[2]

According to the hearing board, the respondent testified that he tried over the period of the next nine months to reach Tinaglia by telephone and by sending Tinaglia copies of documents by FAX that Clifton's lawyer had sent the respondent. The respondent also stated that at one time he managed to reach Tinaglia by telephone but that Tinaglia stated that he was on his way out of town and would call on his return. Tinaglia admitted receiving the call, but stated that he returned the call in a few days. According to the respondent's testimony, he was attempting to communicate to Tinaglia the urgent necessity of signing the documents which would finalize the settlement.

During this time period, Clifton's lawyer was trying, persistently and unsuccessfully, through the respondent, to get Tinaglia's signature on the final settlement agreement, to get Tinaglia to sign over the Hesdorfer Associates stock to Clifton, and to obtain written assurance that the American Express card had been destroyed. Clifton had already paid off the Johannes note and the line of credit as the settlement agreement provided. Clifton's lawyer spoke with the respondent on the telephone to urge that the agreement be concluded. The respondent told him that Tinaglia was the problem but that the documents and signatures would be forthcoming. On many occasions, Clifton's lawyer left telephone messages for the respondent that were not returned. Three separate times, in April, June, and August of 1988, Clifton's lawyer wrote to the respondent and informed him that the settlement might fall through if Tinaglia did not sign the agreement and comply with his obligations under it. The respondent stated that he transmitted copies of those letters to Tinaglia by FAX, but Tinaglia denied receiving them.

The respondent admitted that he himself wrote no letters to Tinaglia, that he did not bill Tinaglia for any time after mid-January 1988, that his office records cannot corroborate that he made the telephone calls or sent the FAXes as he claimed. Tinaglia agreed that his office was at home during this time period and was attended in part by his wife who was at the same time raising a small child. Clifton's lawyer testified that, based on previous experience, it was not like the respondent to fail to respond to correspondence.

As a result of the failure in communication, Clifton filed an action against Tinaglia in September 1988, seeking contribution for Clifton's repayment of the Johannes and OmniBank loans. Judgment was entered

---

**2.** The respondent contends that Tinaglia's belief that the respondent could sign the documents on his behalf was legally incorrect. Whether or not Tinaglia's belief was legally correct, however, is not significant under these circumstances and need not be resolved.

in favor of Clifton against Tinaglia in excess of $35,000. Hesdorfer Associates was closed by this time and was essentially without value. Tinaglia recovered some of the money he paid in judgment after the settlement of a professional malpractice suit that he filed against the respondent.

■ The hearing board was unable to determine, by the standard of clear and convincing evidence, that Tinaglia's version of events, rather than the respondent's, was the correct one. The board therefore premised its subsequent conclusions on the respondent's account of events. The board found that, even under the respondent's account, the respondent violated DR 7–101(A)(1) (a lawyer shall not intentionally fail to seek the lawful objectives of the lawyer's client through reasonably available means), DR 7–101(A)(2) (a lawyer shall not intentionally fail to carry out a contract of employment entered into with a client), and DR 7–101(A)(3) (a lawyer shall not intentionally prejudice or damage the lawyer's client during the course of the professional relationship).[3] The hearing board explained that the respondent's misconduct could properly be deemed "intentional" because it "was more than a single failure; there was a period of inaction or ineffective action lasting over a period of months." The board found that the respondent's responsibilities included, at a minimum, writing letters to Tinaglia when his efforts at using the telephone failed, and explaining the consequences of Tinaglia's failure to sign the documents and otherwise comply with the settlement agreement. If Tinaglia still failed to communicate with him and the respondent could therefore no longer adequately represent his client's interests, the respondent could have taken steps to terminate the client-lawyer relationship. Further, the board concluded that the respondent's failure to maintain more regular contact with Clifton's lawyer after the latter indicated that Clifton might disavow the unconsummated agreement and bring suit

against Tinaglia, and his failure to attempt to dissuade Clifton's lawyer from such a course, were breaches of the respondent's duties as Tinaglia's lawyer.

Our cases support the board's determinations. The respondent failed to effectively communicate with his client over a period of nine months. When it became evident that Clifton was considering repudiating the settlement agreement, and that Tinaglia's interests would be harmed, it was unreasonable for the respondent to continue to rely only on methods of communication that had failed. While not every case involving neglect and inaction will involve violations of DRs 7–101(A)(1)–(3), we have stated that inaction over extended periods of time, as in the present case, may be deemed willful misconduct. *E.g., People v. Bradley,* 825 P.2d 475, 476–77 (Colo.1992) (lawyer's inaction over a period of two years deemed willful misconduct); *People v. Williams,* 824 P.2d 813, 814 (Colo.1992) (continued and chronic neglect over extended periods of time must be considered willful); *People v. May,* 745 P.2d 218, 220 (Colo.1987) (same). We therefore reject the respondent's contention that the proceeding should be dismissed because no violation of the Code of Professional Responsibility has been established.

## II

The hearing board recommended that the respondent receive a private censure, and the panel approved the recommendation. The assistant disciplinary counsel has excepted to private discipline in this case as too lenient. We agree. Under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986 & Supp. 1992) (ABA *Standards*), in the absence of aggravating or mitigating factors, suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

---

**3.** The complaint filed by the assistant disciplinary counsel also charged the respondent with violating DR 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to the lawyer). In its report, the board made no mention of its disposition of this charge, and did not explain why the respondent's conduct did or did not violate DR 6–101(A)(3). Neither of the parties have excepted to the board's report on this basis and we express no opinion on the matter.

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

ABA *Standards* 4.42. Even the standard cited by the hearing board, 4.43, calls for public censure "when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client." *Id.* at 4.43. We recognize, as did the majority of the hearing board, that there are significant factors in mitigation: (1) the absence of a prior disciplinary record, *id.* at 9.32(a); (2) the absence of a dishonest or selfish motive, *id.* at 9.32(b); (3) a timely good faith effort to make restitution or to rectify the consequences of misconduct, *id.* at 9.32(d) [4]; (4) full and free disclosure and cooperative attitude toward the proceedings, *id.* at 9.32(e); and (5) evidence of good character or reputation, *id.* at 9.32(g). In aggravation, the respondent has substantial experience in the practice of law. *Id.* at 9.22(i).

While the factors in mitigation are sufficient to call for a sanction less than suspension, a private censure would be inappropriate. We have previously stated that

> [a] private censure, because it does not inform the public about a lawyer's misconduct, "should be used only when the lawyer is negligent, when the ethical violation results in little or no injury to a client, the public, the legal system, or the profession, and when there is little or no likelihood of repetition." ABA Standards 2.6 (commentary).

*People v. Smith,* 769 P.2d 1078, 1080 (Colo. 1989). In this case, it cannot be said that "the ethical violation results in little or no injury to a client, the public, the legal system, or the profession. . . ." We therefore order that the respondent be publicly censured.

### III

It is hereby ordered that Richard B. Podoll be publicly censured. It is further ordered that Podoll pay the costs of this proceeding in the amount of $609.21 within thirty days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500–S, Dominion Plaza, Denver, Colorado 80202.

---

**4.** The assistant disciplinary counsel characterizes the respondent's settlement of the malpractice suit against him as "forced or compelled restitution" which should be not considered as either aggravating or mitigating. ABA *Standards* 9.32(a); *see People v. Finesilver,* 826 P.2d 1256, 1258–59 (Colo.1992). The assistant disciplinary counsel has not provided the court with a transcript of the hearing before the board, however, and under these circumstances we decline to overturn the board's determination. *See supra* note 1.